UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  WAR ADMIRAL, L.L.C.,                CIVIL ACTION
ET AL.

                                            NO: 09-3217

                                            SECTION: "J" (1)

**ORDER AND REASONS**

Before the Court are Claimant Troy Hamrick's Motion to
Increase Security or in the Alternative to Dismiss the Limitation
(Rec. Doc. 97); Petitioners-in-Limitation War Admiral, L.L.C. and
Turn Services, L.L.C.'s Opposition (Rec. Doc. 123); and Hamrick's
Reply (Rec. Doc. 130), on supporting memoranda with oral argument
held on October 26, 2011.  Also before the Court are supplemental
briefings by Hamrick (Rec. Doc. 150) and Petitioners in
Limitation (Rec. Doc. 152), which were filed after the oral
argument hearing.  Having considered the motion and legal
memoranda, the record, and the applicable law, the Court finds
that Claimant Troy Hamrick's Motion to Increase Security (Rec.
Doc. 97) should be GRANTED.

1

## PROCEDURAL HISTORY AND BACKGROUND FACTS

This lawsuit arises from a collision on the Mississippi
River near Meraux, Louisiana between two vessels and their
respective tows.  The owner and operator of the M/V WAR ADMIRAL
("Petitioners in Limitation" or "Petitioners"), one of the
vessels involved in the collision, filed a petition seeking to
eliminate or limit its liability.  Troy Hamrick ("Claimant"), a
deckhand aboard one of the involved barges, allegedly suffered
injury and filed a claim in the limitation action.  The WAR
ADMIRAL is owned by Petitioner War Admiral, L.L.C. ("War
Admiral") and was operated by Petitioner Turn Services, L.L.C.
("Turn Services").

The collision occurred in thick fog in the early morning of
March 12, 2009 at "Nine-Mile Point"—also known as the "Meraux
Fleet"—a staging area where barges are stored or secured.  The
area is a storage location to and from which barges are moved,
depending on the needs of Turn Services's customers who need tows
built.  At the time of the collision, the WAR ADMIRAL was in the
Meraux Fleet area building a 17-barge tow for customer vessel the
M/V MISS KRISS.  Also at that time, the M/V ACCU VI, a towboat
owned and operated by Defendant Accumarine Transportation LP
("Accumarine"), was traveling upriver pushing two barges with

sweet crude oil.  Claimant Hamrick alleges that as the ACCU VI steamed upriver, she did not sound her horn.  The WAR ADMIRAL's captain spotted the ACCU VI approaching and radioed her, but with no response.  The two tugboats collided, leaving a large gash in the WAR ADMIRAL's stern, and allegedly causing Claimant to fall from his position at the head of an adjacent barge a distance of 14 feet into an empty hopper barge below.  After filing the subject limitation action, Petitioner Turn Services posted a letter of undertaking as security in the amount of $750,000, the value of the WAR ADMIRAL.  Hamrick alleges that his damages total more than $4 million.

## THE PARTIES' ARGUMENTS

Claimant Hamrick proceeds under Supplemental Rule of Admiralty F(7), which expressly authorizes a claimant to move for an increase in the limitation fund or the security posted when it is less than the value of the vessel and its pending freight. Hamrick's main argument is that Petitioners' posted security is woefully insufficient because it is only based upon a valuation of the WAR ADMIRAL.  Hamrick asserts that at the time of the collision, the WAR ADMIRAL was part of a common fleeting enterprise and, therefore, that the value of other vessels should

be included in the limitation fund.  He alleges that the WAR
ADMIRAL, the M/V BLACKBEARD, the M/V OMAHA, and the M/V
SECRETARIAT were all Turn Services vessels working together to
build a tow for a customer, the MISS KRISS, at the time of the
collision.  Therefore, Claimant argues that Petitioners' failure
to establish a fund including at least the value of these vessels
should result in the increase of security, or alternatively,
dismissal of the limitation with prejudice.[1]

Hamrick sets forth facts that he believes invoke the
"flotilla doctrine," under which not only the WAR ADMIRAL's value
should be included in the limitation fund, but also the value of
other vessels under common ownership engaged in a common
enterprise under a single command.[2]  Turn Services allegedly had
a contract to build a 17-barge tow for the MISS KRISS.  Hamrick
alleges that the collision occurred while the WAR ADMIRAL,
BLACKBEARD, and OMAHA were building the tow for the MISS KRISS.
He alleges that the SECRETARIAT was "possibly" engaged in a

---

[1] At times, in his memorandum, Claimant seems to suggest that the value
of the entire fleet should be included in the limitation fund.  He broadly
requests that the Court increase security by the values of "the other vessels
which make up the flotilla."  Rec. Doc. 97-1, at 19.

[2] The Claimant's argument is summarized thusly:  "Clearly, when three or
more push boats work together on behalf of one employer to build a 17 barge
tow for their employer's customer, whose line boat is standing by waiting for
the tow to be assembled, this does not happen by circumstance or without
direction from and the knowledge of the employer."  Rec. Doc. 97-1, at 9.

common venture to the extent it was a "trip boat" "standing by" while the tow was being built.  Rec. Doc. 97-1, at 11.  Multiple vessels operated by Turn Services and located at the Meraux Fleet attend the fleet at all hours to ensure that barges do not break free.  When a customer vessel like the MISS KRISS arrives, Turn Services vessels at the fleet provide the customer with barges for the customer vessel's voyage.  Thus, at the time of the collision at issue, because the WAR ADMIRAL, BLACKBEARD, and OMAHA were all operated together by Turn Services, they were under "common control" as required by the flotilla doctrine.  These vessels were all engaged in the "common enterprise" of building a tow for the MISS KRISS.  Claimant also argues that the value of the fund must be increased by the pending freight, which is the value of any contract under which the flotilla was working at the time of the subject collision.

Petitioners oppose Hamrick's motion on substantive and procedural grounds.  Procedurally, Petitioners argue that the motion to increase security is untimely.  It was filed over two-and-a-half years after the limitation action was filed and the security was posted.  Petitioners argue that the motion's tardiness is inexcusable due to the fact that Hamrick raised the issue of insufficient security in his answer, specifically

alleging that the value of the OMAHA and BLACKBEARD should be included, yet did not raise the issue via motion until two years later. To the extent Hamrick complains of inadequate discovery responses by Petitioners concerning evidence of a flotilla, Hamrick did not move to compel discovery until roughly a month before filing the instant motion to increase security. Trial is set for December 19, 2011, and discovery closed on October 31. The expert report deadline has passed. If more evidence is needed as to the value of vessels comprising any flotilla, appraisals would be needed, and the trial would be delayed on a case that has been on the Court's docket for over two-and-a-half years.

Petitioners also argue that the motion should be denied because two of the three elements of the flotilla doctrine are absent. First, there was no common venture or enterprise. The OMAHA and BLACKBEARD were merely available to help build the tow for the MISS KRISS; they were not necessary to performance of the contract. From the deposition testimony of the WAR ADMIRAL's captain, it is clear that only the WAR ADMIRAL was actually involved in building the tow because only it removed empty barges from the west bank fleet and brought them to the MISS KRISS. Second, the vessels were not under a single command. Hamrick

6

does not identify any individual who had nautical command of all the vessels alleged to be involved in building the 17-barge tow. The mere fact that vessels owned by one entity operate in the same area does not mean that they operate under a single command. Lastly, Petitioners argue that pending freight cannot be computed: the value of any potentially includable contract would be limited to the building of the tow on the date of the collision. There is no evidence in the record by which computation could be made.

In reply, Hamrick argues that the instant motion is timely. He states that he waited to file it because he had anticipated that Accumarine would file such a motion given the alleged solidary nature of Accumarine and Turn Services's liability. When Accumarine failed to do so, Hamrick filed a motion to increase security. Further, Hamrick argues that increasing the limitation fund would not delay the trial: insured values may be used, or the Court may order a hearing. Further, Turn Services could obtain letters of undertaking regarding the values of the other vessels in any flotilla. In supplemental briefings, the parties argue whether, if there is a flotilla, insured value is the appropriate valuation metric.

**DISCUSSION**

Under Supplemental Rule for Admiralty or Maritime Claims and Asset Forfeiture Actions Rule F(7), a claimant in a limitation-of-liability action may move for increased security if he believes that the value of the petitioner's interest in the vessel and pending freight is greater than the security given by the petitioner.  Rule F(7) provides:

> **(7) Insufficiency of Fund or Security.** Any claimant may by motion demand that the funds deposited in court or the security given by the plaintiff be increased on the ground that they are less than the value of the plaintiff's interest in the vessel and pending freight. Thereupon the court shall cause due appraisement to be made of the value of the plaintiff's interest in the vessel and pending freight; and if the court finds that the deposit or security is either insufficient or excessive it shall order its increase or reduction. In like manner any claimant may demand that the deposit or security be increased on the ground that it is insufficient to carry out the provisions of the statutes relating to claims in respect of loss of life or bodily injury; and, after notice and hearing, the court may similarly order that the deposit or security be increased or reduced.

Supplemental Admiralty and Maritime Claims Rule F, 28 U.S.C. Thus, the Court must address (1) the so-called "flotilla doctrine," to determine whether several of the vessels owned by War Admiral and operated by Turn Services should be treated as one vessel for valuation purposes; and (2) whether the value of any contract concerning the MISS KRISS should be included as

8

pending freight.

## A.   The Flotilla Doctrine

The "flotilla doctrine" applies "[w]here vessels are owned by the same person, engaged in a common enterprise, and under a single command." Complaint of Tom-Mac, Inc., 76 F.3d 678, 684 (5th Cir. 1996).  Where vessels are treated as a flotilla, the owner is required to "tender [] all of the vessels in the flotilla, or the value thereof, pending resolution of the underlying claims" in a limitation action. Id. The parties do not dispute that the BLACKBEARD, OMAHA, SECRETARIAT, and WAR ADMIRAL were all owned by War Admiral and operated by Turn Services at the time of the collision.  Thus, only the "common enterprise" and "single command" elements are in dispute.

### 1.   Common Enterprise

The Fifth Circuit has held that vessels must be devoted to a single venture to be part of the same flotilla. Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724, 727 (5th Cir. 1967).  For a vessel to be part of a common enterprise, an important factor is whether the vessel's work is necessary to the performance of the contract. See In re U.S. Dredging Corp., 264 F.2d 339, 341 (2d Cir. 1959), cert. denied, 360 U.S. 932 (1959) (holding that for vessel to limit its liability, it was

required to tender other vessels whose assistance was necessary
to performance of the contract).  Petitioners argue that the
BLACKBEARD and OMAHA were merely *available* to help and thus were
not part of the same enterprise as the WAR ADMIRAL.  However, the
mere fact that vessels do not actively perform work on a contract
does not necessarily mean that they are not contractually engaged
in a common enterprise.  In Matter of Offshore Specialty
Fabricators, Inc., 2002 WL 827398, at *3 (E.D. La. Apr. 30,
2002).

    At the time the instant motion was orally argued, there was
limited proof in the record as to the connection of the
BLACKBEARD, OMAHA, and SECRETARIAT with the work that the WAR
ADMIRAL was performing at the time of the collision.  Claimant
argued that Petitioners' discovery responses concerning this
issue had been insufficient.  Indeed, in response to Claimant's
production request for vessel logs pertaining to the BLACKBEARD
and the OMAHA, Petitioners had refused to provide the logs on
grounds of irrelevance.  Rec. Doc. 97-6, at 19.  They also
refused to produce agreements concerning the operation of these
vessels on the date of the collision and other records that were
relevant as to whether the BLACKBEARD and the OMAHA were working
for Turn Services to build a tow for the MISS KRISS on the date

of the collision.  Id. at 19-20.

In response to the Magistrate Judge's order on Claimant's motion to compel (Rec. Doc. 100), Petitioners produced more documents to Claimant, who was able to take the Rule 30(b)(6) deposition of Timothy Denson Morton, the assistant vice president of risk management for Turn Services.  Morton's deposition testimony and the ship logs in the record prove that the WAR ADMIRAL, BLACKBEARD, and OMAHA were part of a common enterprise. The ship logs for these three vessels all show that on the morning of the collision, on March 12, 2009, the vessels were engaged in work for the MISS KRISS.  The OMAHA log has a notation that until 2:30 a.m., work was done pertaining to the MISS KRISS. Rec. Doc. 150-4, at 4.  Morton testified that this notation means "Work MISS KRISS, drop off seven loads, and pick up 16 empties. (WAR ADMIRAL has the numbers.)".  Rec. Doc. 150-1, at 36.  The BLACKBEARD log states that until 2:50 a.m., the vessel was building a "16 mty barge tow" for the MISS KRISS (Rec. Doc. 150-5, at 4), which Morton confirms to mean that the vessel was building a 16-barge tow for the MISS KRISS (Rec. Doc. 150-1, at 37-38).  Finally, the WAR ADMIRAL log states that until 2:30 a.m., the vessel was building a tow for the MISS KRISS.  Rec. Doc. 150-5, at 9.

The deposition testimony of Captain Johnny Robert Bruce of the WAR ADMIRAL was that the OMAHA, BLACKBEARD, and WAR ADMIRAL all planned to work together in a common enterprise to build the 17-barge tow for the MISS KRISS.  Rec. Doc. 97-2, at 26 (Deposition, page 99, line 22 through page 100, line 1).  The captain specifically testified that these three boats were all in the process of building the tow when the collision occurred.  Id. (Deposition, page 100, lines 2-4).  Apparently, the BLACKBEARD may not have moved any barges around, but the captain testified that the BLACKBEARD was planning to help put the tow together when it arrived at the fleeting area.  Id. (Deposition, page 98, lines 15-19; page 99, lines 10-15).

On the other hand, there is insufficient evidence as to the SECRETARIAT.  Not only does Claimant fail to attach ship logs, but also Morton testified that the SECRETARIAT is a "trip boat" that would not assist in building or breaking a tow for a customer.  Rec. Doc. 150-1, at 32.  Unlike the SECRETARIAT, it is clear that the BLACKBEARD and the OMAHA were part of a common enterprise with the WAR ADMIRAL.  These three vessels were at least to some degree interdependent in executing the MISS KRISS job.  The Court finds that there is sufficient evidence that the WAR ADMIRAL, the BLACKBEARD, and the OMAHA—but *not* the

12

SECRETARIAT—were engaged in a common enterprise.

### 2.  Single Command

The requirement of a single command is nautical; it requires a person or captain with the right to control the vessels at issue.  In Matter of Greenhill Petroleum Corp., 1997 WL 567956, at *2 (E.D. La. Sept. 10, 1997).  However, that person need not be someone providing on-board direction.  In Matter of Offshore Specialty Fabricators, Inc., 2002 WL 827398, at *4.  Hamrick's argument, essentially, is that where Turn Services was using three or four of its vessels on the date of the accident in question to build a tow for a customer vessel, there necessarily must have been common control, or command, over the vessels working jointly to carry out this task.  The point is perhaps well taken that the fact of the BLACKBEARD, OMAHA, and WAR ADMIRAL working closely together is suggestive of common control.  However, the Court cannot rely on the fact of a common enterprise to find that the "single command" element is also present, because "single command" and "common enterprise" are two separate elements of the flotilla test.  See In Matter of Greenhill Petroleum Corp., 1997 WL 567956, at *2 (stating that the "single command" requirement "is separate and distinct from the additional requirements of 'common ownership' or 'common

venture'"").

The Court turns to the deposition testimony of Turn
Services's corporate representative, Mr. Morton, and finds
sufficient evidence that the WAR ADMIRAL, BLACKBEARD, and OMAHA
operated under a single command.  Morton stated that the WAR
ADMIRAL was the "lead fleet boat."  Rec. Doc. 150-1, at 24.
Morton then clarified, "Dispatch notifies the WAR ADMIRAL,
because they're the lead fleet boat, and the WAR ADMIRAL then
disseminates the information" to the fleet boats.  Id. at 31.
The dispatcher is located at Turn Services's headquarters on
Royal Street.  Id. at 27-28.  Still, Morton stated that each
vessel was operated by a captain who is a "manager" who exercises
"discretion" and "judgment."  Rec. Doc. 150-2, at 19.  And yet,
"[e]ach individual vessel is . . . directed by dispatch."  Id.
The Court finds that these three vessels were under the common
control of Turn Services's dispatcher, whoever that unnamed
individual was.  The dispatcher directed the WAR ADMIRAL—as lead
fleet boat—which then passed on information to the BLACKBEARD and
the OMAHA.  It is permissible to "go over the head of the captain
on an individual boat" to find the person or entity with single
command.  In Matter of Offshore Specialty Fabricators, Inc., 2002
WL 827398, at *4.

14

Moreover, although the case law is unclear as to the full range of persons who may exercise single command, the Court believes that a dispatcher meets the requirement. "If two vessels share the same management personnel," this is sufficient, "even if the captains of each vessel are not the same person." Foret v. Transocean Offshore (USA), Inc., 2011 WL 3818635, at *8 (E.D. La. Aug. 29, 2011). A dispatcher communicating information regarding a particular tow-building job necessarily exercises oversight such that he qualifies as shared vessel-management personnel. Cf. Matter of Antill Pipeline Constr. Co., Inc., 1998 WL 321512, at *2 (E.D. La. June 17, 1998) (supervisor with command of the activities of the vessels at the time of alleged accident); In re Weeks Marine, Inc., 2000 WL 33389207, at *1, 4 (M.D. Fla. Nov. 6, 2000), adopted by 2000 WL 33640134 (M.D. Fla. Nov. 28, 2000); (report and recommendation in case involving superintendent of beach renourishment project with supervision over captains of vessels); Complaint of Tom Quinn Co., Inc., 806 F. Supp. 945, 946, 949 (M.D. Fla. Nov. 17, 1992) (project supervisor exercised single command of tug and barge involved in bridge repair project). The Court finds that the WAR ADMIRAL, the BLACKBEARD, and the OMAHA were under Turn Services's single command.

15

The Court holds that there is sufficient evidence that the WAR ADMIRAL, BLACKBEARD, and OMAHA constituted a flotilla.  Thus, the Court will require Petitioners to increase the security to include the value of Petitioners' interest in these three vessels.  The Court rejects Petitioners' argument that the instant motion is untimely; they admit that Supplemental Rule F(7) does not contain a deadline.  Further, it was Petitioners' failure to respond to discovery until the Magistrate ordered a response that was to blame for the initial lack of proof of a flotilla.

The Court finds that there is insufficient evidence in the record to order an increase of security by a certain amount, as to the values of the BLACKBEARD and OMAHA.  The evidence of the vessels' insured values may be relevant to establishing value, but they are not conclusive.  Signal Oil & Gas Co. v. Barge W-701, 654 F.2d 1164, 1173 (5th Cir. 1981), cert. denied, 455 U.S. 944 (1982).  Pursuant to Rule F(7), the Court may order appraisement of the petitioner's interest in the vessels and pending freight.

**B.  Pending Freight**

The Court finds that the value of the MISS KRISS job should be included in the limitation fund as pending freight.  Although

16

pending freight includes the entire value of the contract at issue, "the limitation fund is defined by the 'adventure' at issue." In Matter of Offshore Specialty Fabricators, Inc., 2002 WL 827398, at *5. Thus, where there are distinct phases of a project, the limitation fund will only be increased by the contractual value applicable to the phase ongoing at the time of the collision. Id. Turn Services's assistant vice president of risk management explained that for the MISS KRISS job (and all of Turn Services's jobs), there is a fee for barges coming in and a fee for barges going out. Rec. Doc. 150-1, at 41.[3] There is an "in" charge for every barge dropped off and an "out" charge for every barge picked up. Id. at 43. Morton admitted that to calculate the value of services performed for the MISS KRISS during the time period at issue, one would multiply the "in" or "out" charge—both of which are $225 per barge— by the number of barges moved. Rec. Doc. 150-2, at 2. An invoice submitted by Claimant confirms this: Turn Services charges a $225 rate per unit. Rec. Doc. 150-6, at 1. The invoice shows that on March 11, 2009, Turn Services assisted the MISS KRISS with 7 "in"

---

[3] He further explained that there are other charges calculated. For example, there is a daily rate for barges sitting in the fleet and a charge for moving a barge from one fleet to another. Rec. Doc. 150-1, at 41.

barges;[4] and on March 12, assisted the MISS KRISS with 16 "out"
barges.  See id.; see also Rec. Doc. 150-1, at 39 (Morton stating
that the MISS KRISS arrived at the fleet with 7 barges and left
with 16 barges).  The Court holds that the security must be
increased by pending freight in the amount of $5,175.00.[5]

**CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that Claimant Troy
Hamrick's Motion to Increase Security or in the Alternative to
Dismiss the Limitation (Rec. Doc. 97) is **GRANTED**; and that the
values of the M/V BLACKBEARD, the M/V OMAHA, the M/V WAR ADMIRAL,
and their pending freight are to be included in the limitation
fund.

**IT IS FURTHER ORDERED** that Petitioners increase the security
furnished in the above-captioned limitation action to include the
appraised value of Petitioners' interest in the BLACKBEARD, the
OMAHA, and the WAR ADMIRAL and their pending freight; and that

---

[4] March 11, 2009 was the day before the accident.  However, although the
invoice does not reflect the time that these seven barges were moved, the WAR
ADMIRAL log shows that said vessel began assisting the MISS KRISS at 11:45
p.m. on March 11.  Rec. Doc. 150-5, at 7.  Thus, the work done for the MISS
KRISS in the late evening of March 11 continued into the early morning of
March 12—the date of the collision.

[5] This is calculated by multiplying the $225 per-vessel rate by 23
barges (the sum of 16 "out" barges and 7 "in" barges).

18

Petitioners provide the Court with appraisal of said values no later than **Monday, November 28, 2011**.

New Orleans, Louisiana this 18th day of November, 2011.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE